## 9561

### BALLENGER v. SOUTHERN RY. CO.

#### (90 S. E. 1019.).

1. COMPROMISE AND SETTLEMENT—EXEMPTION FROM LIABILITY—CONTRACT AFTER INJURY—FEDERAL EMPLOYERS' LIABILITY ACT.—Federal Employers' Liability Act, as re-enacted in 1908 (Act April 22, 1908, c. 149, sec. 5, 35 Stat. 66 [U. S. Comp. St. 1913, sec. 8661]), declaring void any contract, the purpose of which is to enable a carrier to exempt itself from liability created by the act, refers only to contracts before an injury, and does not prevent a contract of settlement.

2. RELEASE — INJURY—SETTING ASIDE — FALSE REPRESENTATIONS.—For false representations of a railroad's surgeon as to the extent of an employee's injury, he failing to exercise due care in ascertaining the facts on which he based his opinion as to the condition of the injury, a release of the company's liability, thereafter obtained by the claim agent and signed by the employee to get further employment, as the surgeon knew would be necessary, may be set aside, the employee in signing having acted on the surgeon's representations.

3. MASTER AND SERVANT—INJURY—ASSUMPTION OF RISK—EVIDENCE.—Evidence, in a servant's action for injury to a brakeman in turning a switch, then breaking or theretofore broken, *held* not to show plain, open, and obvious defect, as regards assumption of risk.

4. MASTER AND SERVANT—INJURY—NEGLIGENCE—EVIDENCE.—Evidence of the master's negligence in a brakeman's action for injury in turning a switch, then breaking or theretofore broken, *held* sufficient to go to the jury.

Before WILSON, J., Spartanburg, November, 1916. Reversed.

Action by Fred. B. Ballenger against the Southern Railway Company. Judgment for defendant, and plaintiff appeals.

*Messrs. Gwynn & Hannon,* for appellant, cite: *As to contracts to release:* 56 U. S. L. Ed. 916; Richey Fed. Liability

FOOTNOTE.—As to avoidance of release of claim for personal injuries on account of misstatements by physician as to nature of injuries, see notes in 20 A. &. E. Ann. Cas. 750, 5 L. R. A. (N. S.) 663, and 50 L. R. A. (N. S.) 1091. Validity of release given in consideration of re-employment of releasor by releasee, see 4 A. & E. Ann. Cas. 647.

Act, 66; 55 L. Ed. 336; 59 L. Ed. 1165; L. R. A. 1916d, 646; 180 Fed. 832; 113 C. C. A. 379; 192 Fed. 901; 152 Fed. 211; 31 L. R. A. (N. S.) 7. *Fraud:* 81 S. E. 918; 33 L. Ed. 396; 42 S. E. 614; 73 S. E. 216; 6 L. R. A. 149; L. R. A. 1916d, 144, 147; 4 DeS. 698; 13 L. Ed. 55; 50 L. R. A. (N. S.) 1091; 91 S. C. 332; 224 Fed. 196; 20 L. R. A. (N. S.) 915. *Assumption of risks:* 58 L. Ed. 1070. *Misrepresentations of fact:* 95 S. C. 390.

*Messrs. Sanders & DePass,* for respondent, cite: *As to defect in appliance:* 66 S. C. 256; 69 S. C. 529; 72 S. C. 398; 103 S. C. 113. *Burden of proof:* 26 S. C. 1410; 26 Cyc. 2411; 166 U. S. 619; 179 U. S. 663; Federal Liability Act, 181 Fed. 91; 233 U. S. 80; 21 S. C. 103. *Assumption of risk:* 233 U. S. 492; 102 S. C. 276. *Fraud:* 91 S. C. 332; 224 U. S. 603; 155 Pac. 466; 152 N. W. 635.

December 23, 1916.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

This is an action for damages, alleged to have been sustained by the plaintiff, through the wrongful acts of the defendant; and the appeal is from an order directing a verdict in favor of the defendant.

The allegations of the complaint, material to the questions involved, are as follows: That on or about the 23d of February, 1914, plaintiff was in the employ of the defendant in the capacity of a brakeman on a local freight train, which was running from Spartanburg Junction, S. C., to Asheville, N. C., engaged in interstate commerce. That at, or near, Arden, N. C., plaintiff was ordered to throw a jack switch, as was his duty to do, so that said train might come in on siding. While engaged in throwing said jack switch in the usual and customary way, the block on switch lever struck

plaintiff's right foot, and broke the bones and wounded the tendons so much that he was laid off from work for several months and his right foot was permanently injured. That said injuries complained of above were directly due to the wilfulness, wantonness, negligence and carelessness of defendant, in the following particulars, to wit: In not furnishing the plaintiff a safe and suitable appliance, in that the jack switch was old, worn, rusty and out of date, and not in working order; in not keeping the appliance in safe and suitable repair, so that said switch might be thrown with ease and haste; and in not keeping said switch geared and in proper working order. The defendant denied the allegations of negligence and wilfulness; set up assumption of risk as a defense, and alleged:

"That before commencing this action, the plaintiff, for a valuable consideration, released the defendant company from any liability on account of any injury which he may have received, and defendant pleads the same as a bar to this action."

At the close of the testimony, the defendant made a motion for the direction of a verdict, on the grounds: First, that the plaintiff had voluntarily released the defendant from all liability; second, that the risk was one which he had assumed; and, third, that the testimony fails to show any negligence on the part of the defendant. His Honor, the presiding Judge, sustained the motion, on the ground that the plaintiff had released the defendant from all liability.

The appellant's attorneys have argued the exceptions under two heads, the first of which is whether the release is a bar to the action, under the Federal Employers' Liability Act. Section 5 of that act, as amended in 1908, is as follows:

"Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void: *Provided,* That in any

action brought against any such common carrier under or by virtue of any of the provisions of this act, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought."

The provision of the statute, that a contract, the purpose and intent of which is to enable a common carrier to exempt itself-from liability created by the act, etc., has reference to the contracts made by parties prior to the injury. But there is no provision in the statute preventing the parties from agreeing upon the terms of settlement after the cause of action has arisen out of the injury. In the case under consideration, it is not contended that the parties had entered into a contract before the plaintiff was injured.

2     The next question is whether there was any testimony tending to show fraud or undue influence.

The release bears date the 9th of March, 1914, and recited that it was made "for and in consideration of the agreement of the Southern Railway Company to pay to the above-named payee the sum of one dollar." On the same day the plaintiff executed a receipt containing these words:

"Received, Asheville, N. C., 3-9-1914, of the treasurer of the Southern Railway Company, one dollar in full for above account."

The plaintiff testified as follows:

"Q. Didn't you sign a paper when you went back to work? A. Yes, sir; I signed a paper. Q. Who asked you to sign it? A. The superintendent of the road told me I would have to sign that paper. Q. Which superintendent? A. Of that division. Q. What was his name? A. Superintendent Hodges. And I told him that I had lost a lot of time and suffered a lot, and I wanted to know what disposition that he felt like he could make of this injury. Q. That was after you had signed this release or before? A. That

was before. · And he told me, he says, "The only thing you
can do, if you want to go back to work, is to sign up and go
back to work.' Q. If you wanted to go back to work, to
sign the release and go back to work, and then you went and
signed it and went back to work? A. I had to do that.
* * * I was hard pressed for money and had to go back
to work, and the only way I could get back was to sign that
release. I did not read it, and there was nothing said about
paying any money before I signed it. Q. Why did you sign
that release? A. Because Dr. Prichard told me my foot
was all right, and that I could go back to work. Q. Did he
represent to you that it was well? A. He did. Q. Did
you ask him for a discharge? A. I did. He said it was
not necessary to give me a doctor's dismissal certificate; that
he would simply phone down to the office that I was all
right. I went to the office, and they accepted me, and
shortly afterwards I went out on a run. I saw I could not
work. I saw that my foot was not in the proper condition
to do that kind of work, as it had been represented to me.
He was no doubt mistaken about the matter; but my foot,
I found, was not in a condition to do that kind of work.
Q. Did you rely upon his statement? A. Yes, sir. Q.·
Did you go back to him after you made this run? A. Yes,
sir. Q. Go back to Dr. Prichard? A. Yes, sir. Q.
What did he say then with regard to your foot? A. He
told me that my foot was really hurt worse than he at first
thought that it was. Q. What did he advise you to do?
A. He advised me to get light work. * * *"

Cross-examination:

"Q. When Dr. Prichard was talking to you, did he say
one single word about your signing a paper and going back
to work; don't you know that he did not; that he said noth-
ing about release and knew nothing about any paper at all;
that he was just expressing his opinion to you about the
condition of your foot—his medical opinion? A. I took
his word for it, Mr. Sanders. Q. Answer my question,

Mr. Ballenger, wasn't he just expressing to you his opinion about your foot? A. Well, he told me that the foot was well. Q. That is all he said; he said nothing to you about signing any paper and going back to work? A. Yes, sir; he mentioned that; he said it was necessary, of course, to sign up to go back to work. Q. When did he tell you that, Mr. Ballenger? A. Well, I don't know just when, because I went up there several times; I made several trips to Dr. Prichard's office. Q. Dr. Prichard told you that it was necessary for you to sign a paper to go back to work? A. He didn't say that exactly, but he said you could sign up and go back to work. Q. And you did sign it? A. On the strength of what he told me. Q. Voluntarily? A. Yes, sir; on the strength of what he told me."

Dr. W. J. Chapman, witness for plaintiff, testified:

"Q. Doctor, I believe some months after this injury occurred to Fred you examined his foot? A. Yes, sir. Q. You did not make an X-ray examination of it, did you? A. I did not. Q. Would it be necessary to make an X-ray examination of that injury; as you have heard his complaint here, and as you have heard him describe it to you at the time, would it have been necessary to have him have an X-ray examination made in order to find out whether one of the bones were broken in the foot? A. I don't believe it could be decided without the X-ray. Q. As to whether the bones are broken? A. No; I do not."

There was testimony tending to show that the plaintiff's injuries were permanent.

It will thus be seen that there was testimony tending to show that Dr. Prichard not only advised the plaintiff that his foot was well, but that he phoned to the defendant that the plaintiff was all right; that Dr. Prichard knew, when he advised the plaintiff that his foot was all right, that it would be necessary for the plaintiff to release the defendant from liability in order to get employment; that the plaintiff was

induced to grant the release by reason of his reliance upon the advice of Dr. Prichard as to his physical condition; that the advice of Dr. Prichard was erroneous, and that he failed to exercise due care in ascertaining the facts upon which he based his opinion as to the condition of the plaintiff's injury by failing to resort to the X-ray; that the plaintiff was unduly influenced by the erroneous advice of Dr. Prichard while acting within the scope of his authority; and that such erroneous advice was the direct and proximate cause of the signing of the release by the plaintiff, for which the defendant was responsible.

A master is liable in damages for the wrongful acts of the servant, within the scope of his employment, although they may have been committed in violation of the master's instructions. *Black* v. *State Co.,* 99 S. C. 452, 83 S. E. 1088.

It is a maxim of law that no one should be allowed to take advantage of his own wrong, which would be the case if a master was allowed to derive a benefit from the wrongful acts of the servant, committed while acting within the scope of his employment, as the act of the servant is, in law, the act of the master.

In the case of *Jones* v. *Railway Co.,* 32 Tex. Civ. App. 198, 73 S. W. 1082, it was held that where the allegations of the complaint were to the effect that the railway company's claim agent and the physicians employed by it made false representations to the plaintiff and his wife as to the extent of her injuries, for the fraudulent purpose of procuring a release of damages, when they knew, or by exercise of due diligence could have known, of the severity of her injuries, it was error for the Court to sustain a demurrer to the complaint.

The respondent's attorneys rely, principally, upon the case of *Gulf & C.* v. *Huyett,* 99 Tex. 630, 92 S. W. 454, 5 L. R. A. (N. S.) 669, in which the Court held that false representations made by a surgeon of the railroad company, as to the

extent of the injuries of an employee, cannot be made the basis of setting aside a release, subsequently obtained by the claim agent, although the employee acted on the information so received in signing the release, if the claim agent did not knowingly take advantage of such fact. The following statement appears in that case:

"The representation relied on to avoid a release does not appear to have been made in the transaction, in which the contract of settlement was made, nor by the agent authorized to represent the defendant therein; but, so far as the evidence indicates, it was disconnected from that contract, and made by an agent whose duties, as agent, had no relation to such matters."

These facts show that the principles announced in said case are not applicable to the case under consideration.

As the testimony relative to the question under consideration, is susceptible of more than one inference, there was error on the part of his Honor, the presiding Judge, in granting the motion for the direction of a verdict, and the exception raising this question is sustained.

The defendant gave notice that it would ask that the order, directing a verdict, be sustained upon the additional grounds:

"First. That the evidence shows that this switch and all connected with it was plain, open, and obvious; and that the plaintiff assumed the risks of being injured thereby. Second. That the evidence utterly fails to show any negligence on the part of the defendant."

The record shows that the plaintiff testified as follows:

"Q. What were you ordered to do at Arden? A. There is a spur track that runs back from the main line, or from the house track. There was a car on that spur that we had to pick up, and on that spur there was a jack switch, which was there to prevent loose cars from running back on the main line, which has to be thrown, of course, before you can get back. I had cut the engine loose from the train, and

was coming back on that spur, and I had to run ahead to throw the jack switch. When I got to the jack switch it was apparently all right, looked to be, but I got it straight up, perpendicular, and it hung; it wouldn't go either way. I realized that something had to be done. I put all my force on it, as the train was backing right back on me; and I knew if I didn't do something right there and then, it would probably cause a wreck. I threw all my weight on it, and naturally put out my foot just a little bit, and it turned loose all at once, just the same as a rope or vine or something like that breaking, and not only the weight of the heavy ball which is on the end of the lever, but my own force too, all went down on my foot. The jack switch was old and an old-style one, and worn and rusty and dilapidated, and if it had been in good order there would have been no trouble in throwing it whatever. I had never had any trouble before throwing switches of any sort. * * * I was pulling on it with both hands. I got it up perpendicular, and it hung; couldn't move it either way, and all at once it broke loose and fell on my foot; and I remember distinctly I realized something had to be done; and if it had gone over like it should have done, and like they always had before, my foot would never have been in the position it was, because I put it there, not thinking, in order to get a better purchase on the switch. One hand is ordinarily enough to throw a switch. Just reach down with one hand and take over. There is no trouble to throw a switch if it is in good order. They are usually thrown in a hurry and with haste, because all railroad men are usually in a hurry. and at this particular time the engine and tender was coming right back on me, and it was necessary for me to be in a hurry at that time especially."

There was also testimony tending to show that a little handle on the switch was broken, but it did not appear whether it was broken at the time of the injury or at some other time.

The testimony shows that this ground of the motion was properly overruled. And it, likewise, shows that the second additional ground was properly overruled.

Judgment reversed, and the case remanded for a new trial.